UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FIVE STAR HOTELS, LLC,

                          Plaintiff,

           - against -

INSURANCE COMPANY OF GREATER
NEW YORK,

                          Defendant.

**MEMORANDUM OPINION
& ORDER**

09 Civ. 8717 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          This action involves an insurance coverage dispute arising out of water damage

caused by a frozen and ruptured sprinkler system (the "Incident").  The Incident occurred on

December 24, 2008, at Plaintiff Five Star Hotels's Holiday Inn franchise hotel in Pittsburgh.

Five Star quickly gave notice to its carrier, Greater New York Insurance ("GNY"), and sought

coverage for the damage under its GNY property insurance policy.  GNY denied coverage,

however, claiming that the loss was attributable to Five Star's failure to provide adequate heat to

the stairwells housing the sprinkler system, and that two policy provisions exclude coverage

under such circumstances.  Five Star has moved for partial summary judgment on the coverage

issue, arguing that even if it failed to heat the stairwells, neither exclusion applies.  Five Star has

also moved to strike certain expert evidence offered by GNY indicating that Five Star's failure to

provide adequate heat in the stairwells violated certain fire and safety codes.

          In addition to seeking a declaratory judgment as to coverage, and damages for

breach of contract, Five Star's Complaint asserts a claim under Pa. Cons. Stat. Ann. § 8371 for

interest, punitive damages, attorneys' fees and costs based on GNY's alleged bad faith in its

handling and rejection of Five Star's insurance claim.  (Cmplt., Fourth Cause of Action)  GNY has moved for summary judgment on Five Star's bad faith claim.

Five Star's motion for partial summary judgment on the issue of coverage will be granted, because the endorsement and exclusion cited by GNY do not bar coverage here.  Five Star's motion to strike certain expert testimony will be denied as moot, because this Court has made its summary judgment determination based on the language of the policy, and has not relied on any State fire and safety codes.  GNY's motion for summary judgment concerning Five Star's bad faith claim will be denied, because Five Star is entitled to conduct discovery as to its assertion that GNY's handling and denial of its insurance claim constitute bad faith under Pennsylvania law.

## BACKGROUND

Five Star, a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania, owns – and, until the December 2008 Incident, operated – a Holiday Inn hotel in Pittsburgh.  (Pltf. Rule 56.1 Stmt. ¶ 1)[1]  GNY is an insurance company incorporated under the laws of New York, with its principal place of business in New York, New York.  (Pltf. Rule 56.1 Stmt. ¶ 2)

At the time of the Incident, Five Star held a GNY insurance policy insuring it against, inter alia, property damage to its Holiday Inn hotel.  (Pltf. Rule 56.1 Stmt. ¶ 4)  GNY does not dispute that Five Star paid all premiums owing under the policy.  (Pltf. Rule 56.1 Stmt. ¶ 5)  The policy provides $9 million in coverage for damage to the building, $1.1 million for

---

[1]  To the extent that this Court relies on facts drawn from the parties' Rule 56.1 statements, it has done so because the opposing party either does not dispute those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . .  fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).

damage to personal property, and $2.5 million for business interruption and "extra expense."[2] (Pltf. Rule 56.1 Stmt. ¶ 31)

In or about December 2005, Five Star began installing an upgraded fire-preventive automatic sprinkler system in the hotel. The new system "extended sprinkler heads to each room of the Hotel by running various lengths of piping that tapped off of the existing standpipes in numerous locations." (Pltf. Rule 56.1 Stmt. ¶ 9) In addition, "[w]ater-flow switches and water shut-off valves were positioned at each connection point of the standpipes and were monitored at the main sprinkler control panel in the basement of the Hotel."[3] (Pltf. Rule 56.1 Stmt. ¶¶ 11-12)

In the early morning hours of December 24, 2008, two standpipe couplings in the sprinkler system on the tenth and eleventh floors of the hotel burst. (Pltf. Rule 56.1 Stmt. ¶ 12) Before the water flow was turned off, a large volume of water from the sprinkler system flowed down to the lower floors of the hotel, causing extensive property damage. (Pltf. Rule 56.1 Stmt. ¶ 13) Five Star notified GNY of the Incident on December 24, 2008, and requested coverage for property damage, business interruption, and "extra expense" resulting from the Incident. (Pltf. Rule 56.1 Stmt. ¶ 24) Because of the Incident, the hotel has been closed since December 24, 2008. (Pltf. Rule 56.1 Stmt. ¶ 23)

On or about January 2, 2009, GNY retained CEC Forensic Engineers to assist it in determining why the couplings failed. (Def. Rule 56.1 Stmt. ¶ 41) On January 9, 2009, CEC

---

[2] "Extra expense," as used in the policy, "means necessary expenses [the insured] incur[s] during the 'period of restoration' that [the insured] would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss." (Dhupar Decl., Ex. A at FSH 48)
[3] The new "wet" system replaced the previous "dry" fire suppression system, which "consisted of a fire pump, two standpipes (one in the East stairwell and one in the West stairwell), with fire hose access points on each floor." (Pltf. R. 56.1. Stmt. ¶ 8)

issued a Forensic Engineering Report detailing its findings.  (Def. Rule 56.1 Stmt. ¶ 42)  The

Report states:

> Many conditions can cause or initiate cracks or splits in piping.  Mechanical
> damage, excessive internal pressure, internal water freezing, manufacturing
> defects, material defects, and chemical incompatibility are among the primary
> reasons for metal component failures.  However, since six individual areas . . .
> experienced failure at the same time, all of the above causes can be eliminated
> except for excessive pressure and internal water freezing.

(Rappel Decl., Ex. 5, at HOL 94)  The Report went on to conclude that water pressure did not

cause the Incident, and that instead "water freeze and its associated expansion was the cause of

the piping failures."  (Id. at HOL 95)  Five Star does not dispute that the rupture was "the result

of [the] freezing of water within the standpipes."  (Pltf. R. 56.1 Stmt. ¶ 12)

On January 14, 2009, GNY sent Five Star a Reservation of Rights letter stating

that it needed to complete its investigation before making a coverage determination.  (Def. Rule

56.1 Stmt. ¶ 43; Rappel Decl., Ex. 6)  The Reservation of Rights letter referenced a number of

policy provisions that GNY claimed could justify a denial of coverage, including two provisions

that are at issue here.  GNY cited the policy's Protective Safeguards Endorsement, which

provides, at Clause A, as follows:

> 1. As a condition of this insurance, you are required to maintain the protective
>    devices or services listed in the Schedule above.
>
> 2. The protective safeguards to which this endorsement applies are identified by
>    the following symbols:
>
>    **"P-1" Automatic Sprinkler System**, including related
>    supervisory services. . . .

(Id.; see also Pltf. Rule 56.1 Stmt. ¶ 39; Dhupar Decl., Ex. A at FSH 69) (emphasis in original)

GNY also cited the policy's exclusion for faulty design or maintenance, which

provides:

4

3.  We will not pay for loss or damage caused by or resulting from any of the following 3.a through 3.c.  But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

       *         *         *         *

c. Faulty, inadequate or defective:

       *         *         *         *

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

       *         *         *         *

(3) Maintenance;

of part or all of any property on or off the described premises.

(Rappel Decl., Ex. 6; Pltf. Rule 56.1 Stmt. ¶ 38; Dhupar Decl., Ex. A at FSH 62-63)

The record reflects significant delays in the processing of Five Star's claim, some of which appear to be associated with GNY's request for documents and desire to conduct destructive testing of the burst pipes.  On January 28, 2009, GNY requested that Five Star "immediately provide all installation and maintenance documents relative to the fire suppression system installed on the Property."  (Def. Rule 56.1 Stmt. ¶¶ 46-47; Rappel Decl., Ex. 10)  GNY repeated that request on March 24, 2009.  (Def. Rule 56.1 Stmt. ¶ 52)

On February 20, 2009, GNY made arrangements to have Rimkus Consulting Group schedule destructive testing of the portions of the pipes that had burst.  (Def. Rule 56.1 Stmt. ¶ 48)

On February 23, 2009, Five Star submitted to GNY a partial proof of loss in the amount of $750,000.  (Pltf. R. 56.1. Stmt. ¶ 25)

On March 24, 2009, GNY wrote to Five Star advising that Rimkus would conduct destructive testing at the hotel on March 30, 2009.  (Def. Rule 56.1 Stmt. ¶ 51)  On March 26, 2009, Five Star's counsel objected to such testing, however, stating that Five Star "[could] not

5

permit destructive testing of what may be important evidence in the event of a denial of coverage." (Def. Rule 56.1 Stmt. ¶ 53; Rappel Decl., Ex. 16)

On April 7, 2009, Five Star restated its position that destructive testing was not necessary given the conclusion of GNY's expert that the Incident had been caused by frozen sprinkler pipes. Five Star advised GNY, however, that "[i]f, despite its consultant's determination that freezing caused the loss at issue, [GNY] insists that the destructive testing take place before it can make a coverage determination, then [Five Star] will cooperate with GNY to develop a plan to allow the destructive testing to go forward without prejudice to [Five Star] in the event of a coverage denial." (Def. Rule 56.1 Stmt. ¶ 54; Rappel Decl., Ex. 17) In its April 7, 2009 letter, Five Star also asserted that a frozen sprinkler system is a covered cause of loss under the policy. (Pltf. Rule 56.1 Resp. ¶ 79)

On May 8, 2009, Five Star again wrote to GNY to advise that it was in danger of losing its Holiday Inn franchise license and to request a coverage decision by May 25, 2009. (Pltf. Rule 56.1 Resp. ¶¶ 80-81; Artese Opp. Decl., Ex. 15) On May 20, 2009, GNY responded that it could not yet render a coverage decision because it had not been able to conduct destructive testing of the pipes. (Def. Rule 56.1 Stmt. ¶ 57) Five Star surrendered its franchise license in June 2009, allegedly because of its inability to assure the franchisor that it would commence reconstruction and reopen the hotel. (Pltf. R. 56.1 Resp. ¶ 87; Artese Opp. Decl., Ex. 16)

Destructive testing of the standpipes ultimately took place on July 8-9, 2009. (Def. Rule 56.1 Stmt. ¶ 65) On July 20, 2009, plaintiff's counsel reiterated Five Star's demand for a speedy coverage determination, and GNY responded on July 21, 2009, stating that it was awaiting a report from the expert who had performed the destructive testing. (Def. Rule 56.1

Stmt. ¶¶ 66, 67; Rappel Decl., Exs. 29, 30)  GNY received that report on August 14, 2009.  The report indicated that the failure of the couplings had been caused by the "freezing expansion of the water inside the pipe system." (Def. R. 56.1 Stat. ¶ 69; Rappel Decl., Ex. 32)  On September 17, 2009, GNY advised Five Star of its determination that the loss was not covered.  (Pltf. Rule 56.1 Stmt. ¶ 26; Artese Decl., Ex. D)  In its September 17, 2009 letter, GNY relied on, inter alia, the Protective Safeguards Endorsement and the faulty design or maintenance exclusion discussed above.  (Artese Decl., Ex. D)

On October 15, 2009, Five Star filed this action, seeking (1) a declaratory judgment that GNY wrongfully denied coverage; (2) damages for breach of the insurance policy; (3) damages for breach of GNY's contractual obligation to pay ServiceMaster, a third party that performed ameliorative work at the hotel; and (4) interest, punitive damages, attorneys' fees and costs under 42 Pa. Cons. Stat. Ann. § 8371, which provides for such relief where an insurer has acted in bad faith in denying a claim.  (Cmplt. ¶¶ 32-55)

## THE PENDING MOTIONS

Five Star has moved for partial summary judgment on the issue of coverage and seeks a ruling (1) that the Incident constitutes a covered loss; (2) that GNY has breached the policy; and (3) striking GNY's first and second affirmative defenses, which are based on the Protective Safeguards Endorsement and the faulty design or maintenance exclusion.

Five Star has also moved to strike Paragraphs 16 through 24 of the declaration of GNY's expert witness Timothy McGreal, along with McGreal's Report of Findings.  (See McGreal Decl., Ex. 2)  In those paragraphs and in his report, McGreal opines that Five Star did not comply with certain sprinkler system maintenance obligations imposed by Pennsylvania law. (See id.; McGreal Decl., Ex. 2)

7

Finally, GNY has moved for summary judgment on the Complaint's fourth cause of action, which alleges that GNY denied Five Star's claim in bad faith and in violation of 42 Pa. Cons. Stat. Ann. § 8371.

## DISCUSSION

## I.        SUMMARY JUDGMENT

Summary judgment is appropriate only when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Whether facts are material is a determination made by looking to substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A dispute about a genuine issue exists" where "the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (internal quotation marks omitted).  Courts "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

"In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim."[4]  Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). The non-movant "cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts,'"  Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005) (quoting

---

[4]  As explained in Part II below, GNY bears the burden of proof as to the applicability of the two exclusions on which it relies.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)), and "'may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.'"  Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)).

Under Pennsylvania law[5], "'[t]he task of interpreting [an insurance] contract is generally performed by a court rather than by a jury.'"  401 Fourth Street, Inc. v. Investors Ins. Group, 583 Pa. 445, 454 (2005) (quoting Madison Construction Co. v. Harleysville Mut. Ins. Co., 557 Pa. 595, 601 (1999)); see also Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996) ("[T]he initial interpretation of a contract is a matter of law for the court to decide.").  "Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous."  Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, 136 F.3d 82, 86 (2d Cir. 1998).

"When the language of a policy is clear and unambiguous, a court is required to give effect to that language.  When a provision in a policy is ambiguous, however, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy[] and controls coverage."  401 Fourth Street, Inc., 583 Pa. at 449; see also Banks v. Allstate Ins. Co., 1993 WL 40113, at *4 (E.D. Pa. Feb. 12, 1993) (quoting Steele v. Statesman Ins.Co., 607 A.2d 742, 743 (Pa. 1992) ("'Review is

---

[5] The parties rely on Pennsylvania law in their briefs, and the Court agrees that Pennsylvania law governs this dispute.  Five Star's principal place of business is in Pennsylvania; the hotel in question is located in that state; the incident causing the loss occurred in Pennsylvania; and the policy was designed to deal with risks that would arise in Pennsylvania.  For all these reasons, Pennsylvania "'has the most significant contacts with the matter in dispute.'"  Auten v. Auten, 308 N.Y. 155 (1954) (quoting Rubin v. Irving Trust Co., 305 N.Y. 288, 305 (1953)).

aimed at ascertaining the intent of the parties as manifested by the language of the written instrument.  Where the provision of the policy is ambiguous, the policy provision is construed in favor of the insured and against the insurer, the drafter of the instrument.'"").  Accordingly, when the insurer relies on an exclusion containing ambiguous language, and where there is a reasonable construction of the exclusion – taking into account the policy as a whole – that provides coverage, summary judgment in favor of the insured is appropriate.  See Prudential Prop. & Cas. Ins. Co. v. Sartno, 588 Pa. 205 (2006) (upholding summary judgment in favor of the insured where insurer relied on ambiguously worded exclusion).

## II.    FIVE STAR IS ENTITLED TO SUMMARY JUDGMENT AS TO COVERAGE

GNY opposes Five Star's motion for partial summary judgment by arguing that coverage of the loss here is precluded by Clause A of the Protective Safeguards Endorsement – which requires Five Star to "maintain" a sprinkler system – and by the exclusion for damage caused by faulty design or maintenance.  The Court considers each argument below.

### A.    THE PROTECTIVE SAFEGUARDS ENDORSEMENT DOES NOT BAR COVERAGE

As its first affirmative defense, GNY's Answer pleads that, under the "Protective Safeguards Endorsement," Five Star was required to "maintain" an automatic sprinkler system, that it failed to do so, and that its failure constitutes "a breach of an express condition of coverage" that deprives Five Star of any right to coverage.  (Answer, ¶¶ 31-35)

Clause A of the Protective Safeguards Endorsement states:

1. As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.

2. The protective safeguards to which this endorsement applies are identified by the following symbols:

> **"P-1" Automatic Sprinkler System**, including related
> supervisory services. . . .

(Pltf. Rule 56.1 Stmt. ¶ 39; Dhupar Decl., Ex. A at FSH 69) (emphasis in original)

       The parties disagree as to the scope of Five Star's obligation to "maintain" the automatic sprinkler system.  GNY argues that Five Star was required to "maintain an operational automatic sprinkler system," and that in "failing to protect the system from freezing" Five Star breached its obligation to "maintain" the system.  (Def. Br. 20)  Five Star argues that it was merely required to "keep the Sprinkler System in place and not remove or disable it."  (Pltf. Br. 19)

       In contending that it was not required – as a condition precedent to any coverage under the policy – to ensure that the sprinkler system was in working order at all times, Five Star argues that:

> (1)     "maintain" is ambiguous, that one reasonable interpretation of "maintain" is to "to keep in place or in existence," and that because ambiguous terms must be interpreted against the carrier, "maintain" should be interpreted to require no more than keeping an automatic sprinkler system in place; and

> (2)     Clause B of the Protective Safeguards Endorsement – which states that GNY "will not pay for loss or damage caused by or resulting from fire if, prior to the fire, [the insured] . . . failed to maintain any protective safeguard . . . over which [the insured] had control in complete working order" (Dhupar Decl., Ex. A at FSH 70) (emphasis added) – makes clear that Clause A requires something less than maintenance of the sprinkler system in "complete working order."

> **1.     The Term "Maintain" is Ambiguous and Must Be
> Interpreted in a Manner Favorable to the Insured**

       As noted above, under Pennsylvania law, when a policy provision is ambiguous, "the policy is to be construed in favor of the insured."  401 Fourth Street, Inc., 583 Pa. at 449; see also Prudential Prop. & Cas. Ins. Co., 588 Pa. at 212 (quoting Standard Venetian Blind Co. v.

Am. Empire Ins. Co., 503 Pa. 300, 303 (1983) ("'Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement.'"); see also Wall Rose Mut. Ins. Co. v. Manross, 939 A.2d 958, 962 (Pa. Super. 2007) ("When an insurer relies on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense.").   In addition, when construing ambiguous terms, courts "will not consider merely individual terms utilized in the insurance contract, but the entire insurance provision to ascertain the intent of the parties." 401 Fourth Street, 583 Pa. at 455.

A provision of a policy is ambiguous "'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" Madison Construction Co. v. Harleysville Mutual Ins. Co., 557 Pa. 595, 605 (1999) (quoting Hutchison v. Sunbeam Coal Co., 513 Pa. 192, 201 (1986)).  Whether a term is susceptible to different constructions is "not a question to be resolved in a vacuum"; rather, terms should be found ambiguous "if they are subject to more than one reasonable interpretation when applied to a particular set of facts." Prudential Prop. & Cas., 588 Pa. at 212.  Here, the policy does not define the word "maintain" and the policy's requirement that the insured "maintain" a sprinkler system is ambiguous, because the term "maintain" is "reasonably susceptible of different constructions" and is "capable of being understood in more than one sense." Madison Construction Co., 557 Pa. at 605.

In Breton, LLC v. Graphic Arts Mut. Ins. Co., No. 1:09-cv-60 (AJT/TRJ), 2009 WL 3762302, at *7 (E.D. Va. Nov. 10, 2009), a court interpreting identical policy language concluded "that the use of the word 'maintain' in the [Protective Safeguards] Endorsement is ambiguous."  In that case, a fire destroyed Breton's warehouse properties.  The court explained:

> Following the fire, it appeared that a sprinkler system installed in . . . one of the damaged warehouse properties was not triggered by the fire because its water supply valve was in the "closed" position at the time of the fire, thereby shutting off the system and rendering it inoperable.

Breton, 2009 WL 3762302, at *1.

Breton's policy contained a "Protective Safeguards Endorsement" identical to that at issue here.  Accordingly, under its policy, Breton was required "'[a]s a condition of this insurance,'" to "'maintain the protective devices or services listed in the Schedule above.'"  The required "'protective devices or services'" included "'an automatic sprinkler system [and] related supervisory services.'"  Id. at *2 (quoting Breton's Commercial Package Policy).

Breton sought coverage after the fire destroyed its property.  The insurer argued, however, that the Protective Safeguards Endorsement excluded coverage, because in failing to ensure that the water supply valve was in the open position and that the sprinkler system was operable, Breton had not met its obligation to "maintain" an automatic sprinkler system.  Id. at *1.

The arguments made by the parties in Breton are nearly identical to those made here:

> With respect to the first issue – whether Breton fulfilled the condition that it "maintain" an automatic sprinkler system, the material facts themselves are not in dispute.  What is in dispute is the meaning of the word "maintain" in paragraph 1a of the Endorsement.  On the one hand, Breton contends that this condition requires only that an automatic sprinkler system is installed in the building and not removed during the policy term. . . . On the other hand, [the insurer] contends that this condition requires not only that an automatic sprinkler system be installed and not removed, but that the insured periodically inspect and keep the system in good operating order.

Id. at *6.

The <u>Breton</u> court concluded that "maintain" – as used in the "Protective Safeguards Endorsement" – was ambiguous, and accordingly that it was appropriate to interpret the term <u>contra</u> <u>proferentem</u>, against the drafter.  Because the <u>Breton</u> court's reasoning is directly applicable here, it will be quoted at some length:

> The threshold question for determining whether a court will apply the doctrine of <u>contra</u> <u>proferentem</u> is whether the policy language is ambiguous.  A policy is ambiguous if it can be reasonably interpreted in more than one manner.  <u>Seals</u>, 674 S.E.2d at 862; <u>see also</u> <u>Resource Bankshares Corp. v. St. Paul</u>, 407 F.3d 631, 636 (4th Cir. 2005).  Here, there is a wide range of meanings of "maintain."  For example, the American Heritage Dictionary provides seven definitions for the verb "maintain," from the restrictive and narrow meaning "to keep in existence," to "keep in an existing state; preserve or retain," to the broader meaning "[t]o keep in a condition of good repair or efficiency."  Similarly, among the definitions included in Webster's dictionary is "to keep in existence or continuance."  Black's Law Dictionary has a number of definitions for "maintain," as it relates to property, that range from "to continue in possession of" to "to care for (property) for purposes of general repair and upkeep."  Following the rule of <u>contra</u> <u>proferentem</u>, the Court finds that the narrower definition of "maintain" is both a reasonable one and one that increases rather than denies or decreases coverage.

<u>Id</u>. at *7.  Accordingly, the <u>Breton</u> court concluded that Breton met its obligation under the Protective Safeguards Endorsement, Clause A, to "maintain" an automatic sprinkler system once a sprinkler system was installed and kept in place.  <u>Id</u>.  The <u>Breton</u> court reached this conclusion even though the sprinkler was inoperable at the time of the fire.[6]  <u>Id</u>.

<u>Breton</u> is directly on point and its reasoning will be applied by this Court.  As in <u>Breton</u>, the term "maintain" is hopelessly ambiguous here.  The system in this case was "an automatic sprinkler system that extended sprinkler heads to each room of the Hotel by running various lengths of piping that tapped off of the existing standpipes in numerous locations."  (Pltf.

---

[6]  In concluding that the narrower definition of "maintain" should be adopted, the court noted that given "the vagaries of the word 'maintain,'" a contrary rule "would necessarily require an insured to guess at what its duties and responsibilities are, something that Virginia law seeks to avoid when interpreting the language of an insurance policy."  <u>Id</u>.

Rule 56.1 Stmt. ¶ 9)  Furthermore, "[w]ater-flow switches and water shut-off valves were positioned at each connection point of the standpipes and were monitored at the main sprinkler control panel in the basement of the Hotel."  (Pltf. Rule 56.1 Stmt. ¶ 11)

Applied to this system, an obligation to "maintain" could mean that Five Star was obligated to keep the switches and valves in the open position.  It could mean that Five Star was obligated to ensure that all piping and standpipes were properly functioning.  As GNY argues, it could mean that Five Star was obligated to ensure not only that the sprinkler system was functioning but to take steps to prevent the water in the system from freezing.  Or, as Five Star argues, it could simply mean that Five Star was obligated to keep the system in place and not to dismantle it.  Any of these meanings would be a reasonable application of the word "maintain" as used in the policy.[7]

Because ambiguous policy provisions are "to be construed in favor of the insured," however, see 401 Fourth Street, Inc., 583 Pa. at 449, this Court must apply the reasonable interpretation most favorable to Five Star;  namely, that Clause A requires Five Star only to keep an automatic sprinkler system in place on the premises.  Clause A does not require Five Star to ensure that the water in the system does not freeze.  Accordingly, Five Star's coverage claim is not barred by any breach of the Protective Safeguards Endorsement.[8]

---

[7]  Had GNY sought to impose on Five Star an obligation to ensure that the sprinkler system was maintained in good working order at all times, it could, of course, have inserted such a provision in Clause A of the Protective Safeguards Endorsement.  As discussed below, it used the language "maintain in complete working order" in Clause B of this same Endorsement.

[8]  The cases GNY cites (Def. Br. 15-16) are distinguishable, because the clauses at issue do not suffer from comparable ambiguity.  In Wabash Properties, Inc. v. Transport Indem. Co., 1985 WL 2452 (N.D. Ill. 1985) and Goldstein v. Fidelity & Guaranty Ins. Underwriters, 86 F.3d 749, 752 (7th Cir. 1996), for example, the policies required insureds to maintain a sprinkler system in "complete working order."  And in Saiz v. Charter Oak Fire Ins. Co., 2007 WL 2701398, the policy excluded coverage of sprinkler leakage "unless [the insured has] protected the system

2. **Clause B of the Protective Safeguards Endorsement Indicates that "Maintain," as Used in Clause A, Does Not Require the <u>Insured to Keep the Sprinkler System in Working Order</u>**

The language GNY uses in Clause B of the Protective Safeguards Endorsement supports Five Star's argument that Clause A does not require an insured to maintain a sprinkler system in working order.  Clause B provides, in relevant part:

> We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you . . . [f]ailed to maintain any protective safeguard . . . over which you had control, <u>in complete working order</u>.

(Dhupar Decl., Ex. A, at FSH 70) (emphasis added).   If Clause A – which, GNY argues, imposes a "condition precedent" for any coverage under the policy (Def. Br. 16) – requires insureds to maintain a sprinkler system in complete working order, then Clause B would not need to specify that failure to maintain such a system in "complete working order" will result in an exclusion of coverage for fire losses.  Because Pennsylvania law embraces "the cardinal principle of interpretation that an insurance policy must be construed in such a manner as to give effect to all of its provisions," <u>Mutual of Omaha Ins. Co. v. Bosses</u>, 428 Pa. 250, 254 (1968), it follows that Clause A imposes a lesser obligation than maintaining a sprinkler system in complete working order.

The <u>Breton</u> court reached the same conclusion:

> . . . the Court finds significant that the word "maintain" appears again in paragraph 2b of the Endorsement with the qualifying phrase "in complete working order."  Specifically, paragraph 2b excludes coverage where the insured "[f]ailed to maintain [the automatic

---

against freezing." <u>Id.</u> at *6.  Finally, in <u>Star Varifoam Corp. v. Buffalo Reinsurance Co.</u>, 64 N.C. App. 306 (N.C. App. 1983), the policy provided:  "It is agreed that the whole of the protections provided for the safety of the insured property shall be <u>maintained</u> in <u>good order</u> throughout the currency of this Certificate and . . . that such protection shall not be withdrawn or varied to the detriment of the interests of the Underwriters without their consent."  <u>Id.</u> at 309 (emphasis added).  In sum, the cases cited by GNY involve policy language that imposes much clearer obligations on the insured than the clause at issue here.

sprinkler system] ... in complete working order."  When considering both usages, the Court must conclude that the word "maintain" in paragraph 1a must have a meaning more limited than the phrase "maintain in complete working order."  While there certainly could be imported into the word "maintain" duties that fall short of those necessary to keep a sprinkler system "in complete working order," there is no need to do so in order to reach a reasonable meaning for the purposes of paragraph 1a.

Breton, 2009 WL 3762302, at *7.

In sum, Clause A of the Protective Safeguards Endorsement does not require an insured to maintain an automatic sprinkler system in working order.  Accordingly, Five Star's failure to ensure that the water in the sprinkler system did not freeze does not bar its claim for coverage.

## III.   THE EXCLUSION FOR FAULTY DESIGN OR FAULTY MAINTENANCE DOES NOT BAR FIVE STAR'S CLAIM

GNY argues that the policy's general exclusion for losses caused by faulty design or faulty maintenance bars Five Star's claim.  As discussed below, while the policy contains a general exclusion for such losses, it also contains an exception to this general rule, set forth in what is known as an "ensuing loss provision."  The effect of the ensuing loss provision here is to restore coverage – even when a loss was caused by faulty design or faulty maintenance – where the damage was caused by a "Covered Cause of Loss."[9]  The applicable portion of the policy

---

[9]  "Ensuing loss provisions" have been the subject of frequent analysis in Pennsylvania courts. See, e.g., Smith v. Westfield Co., 2007 WL 1740816, at *2 (E.D. Pa. June 15, 2007) (quoting Eckstein v. Cincinnati Ins. Co., 469 F. Supp. 2d 455, 463 (W.D. Ky. 2007)) (describing effect of ensuing loss provision; "'[F]aulty construction losses are excluded, but losses taking place afterward, or as a result of faulty construction, are covered.  The exclusions still apply despite the applicability of the ensuing loss provision.  For example, water damage ensuing from a defective roof is covered as an ensuing loss, but the exclusion for faulty construction excludes coverage to repair the roof.'"); St. Mary's Area Water Auth. v. St. Paul Fire & Marine Ins. Co., 472 F. Supp. 2d 630, 637 (M.D. Pa. 2007) (ensuing loss provision "allow[s] recovery for losses brought about by an uncovered risk as long as that risk was in the sequence of events proximately caused by a covered risk"); Myung Sung, Inc. v. Firstline Nat. Ins. Co., 1996 WL 57937, at *1 (E.D. Pa.

("Causes of Loss – Special Form") defines "Covered Causes of Loss" to include "leakage from

fire extinguishing equipment."  (Dhupar Decl., Ex. A at FSH 68)  Accordingly, the exclusion for

losses caused by faulty design or faulty maintenance does not bar Five Star's claim.

### A.      Relevant Policy Provisions

Five Star's GNY policy is an "all risks" policy.  In other words, it covers all

"Direct Physical Loss" unless the loss is excluded or limited.  (Id. at FSH 60)  The exclusion for

faulty design or faulty maintenance provides, in relevant part:

> 3.  We will not pay for loss or damage caused by or resulting from any of the
> following 3.a through 3.c.  But if an excluded cause of loss that is listed in 3.a.
> through 3.c. results in a Covered Cause of Loss, we will pay for the loss or
> damage caused by that Covered Cause of Loss.
> 
>     *      *      *      *
> 
> c. Faulty, inadequate or defective:
> 
>     *      *      *      *
> 
>   (2) Design, specifications, workmanship, repair, construction,
> renovation, remodeling, grading, compaction;
> 
>     *      *      *      *
> 
>   (3) Maintenance;
> 
> of part or all of any property on or off the described premises.

(Dhupar Decl., Ex. A at FSH 60) (emphasis added)  The "ensuing loss provision" (underlined

above), provides that even where a cause of loss is subject to an exclusion, GNY "will pay for

the loss or damage" where the cause of the loss is a "Covered Cause of Loss."  (Id. at FSH 62).

In order to determine what is a "Covered Cause of Loss" here, the Court must first

examine the policy's Declarations Page.  The Declaration Page states that the "Causes of Loss –

---

1996) ("The ensuing loss provision . . . provides coverage for certain secondary losses ultimately
caused by excluded perils.").

Special Form" applies.  (Dhupar Decl., Ex. A at FSH-1, FSH-60)  The "Causes of Loss – Special Form" provides:

> A.  When Special is shown in the Declarations, Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is:
>
>> 1.  Excluded in Section B., Exclusions; or
>>
>> 2.  Limited in Section C., Limitations;
>>    that follow.

(Dhupar Decl., Ex. A at FSH 60)  The Definitions section of the "Causes of Loss – Special Form" includes in its list of "Specified Causes of Loss" "leakage from fire extinguishing equipment."  (Id. at FSH 68)  Accordingly, there is no doubt that leakage from an automatic sprinkler system is specifically covered by the "ensuing loss provision" and is therefore not excluded under the general exclusion for faulty design or faulty maintenance.

Other provisions in the "Causes of Loss – Special Form" confirm this interpretation.  For example, Section B(2)(g) of the Special Form excludes from coverage certain categories of water damage resulting from freezing, but includes an explicit carve-out for damage caused by leaks from "fire protective systems":

> (2)  We will not pay for loss or damage caused by or resulting from any of the following:
>
>> (g)  Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:
>>
>>> (1) You do your best to maintain heat in the building or structure; or
>>>
>>> (2) You drain the equipment and shut off the supply if the heat is not maintained.

(Dhupar Decl., Ex. A at FSH 62) (emphasis added).[10]

Taken together, these provisions make clear that damage resulting from a frozen and leaking sprinkler system is a "Covered Cause of Loss" under the policy.[11]  Because of the ensuing loss provision, the exclusion for faulty design or faulty maintenance does not bar coverage for water damage resulting from the frozen sprinkler system.[12]

*          *          *          *

Five Star's motion for partial summary judgment will be granted.  The Court finds that (1) the Incident constitutes a covered loss under the policy; (2) in failing to provide

---

[10]  This provision also makes clear that Five Star did not forfeit coverage by failing to maintain heat in the hotel sufficient to prevent the water in the sprinkler system from freezing.

[11]  Five Star is also entitled to recover for the cost of repairing the sprinkler system.  In the "Causes of Loss – Special Form," GNY states:  "we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage . . . is directly caused by freezing." (Id. at FSH 65)

[12]  The cases cited by GNY provide no support for its position.  In Vermont Elec. Power Co., Inc. v. Hartford Steam Boiler Inspection & Ins. Co., 72 F. Supp. 2d 441, 444-45 (D. Vt. 1999), for example, the court, applying Vermont law, determined that an ensuing loss provision did not restore coverage for damage to transformers that had been defectively designed.  The court made clear that an ensuing loss would be covered, however:  "[a]n ensuing loss would be one which occurred subsequent to the overheating of the transformers, for example, fire destruction of the building which housed the transformers."  Id. at 445.  This case thus supports Five Star's interpretation of the ensuing loss provision.

The same is true of Narob Dev. Corp v. Ins. Co. of North America, 631 N.Y.S.2d 155, 156 (1st Dept. 1995) (ensuing loss provision does not restore coverage where "there was no collateral or subsequent damage or loss as a result of the collapse of the free-standing retaining wall").

Finally the facts in 80 Broad Street Co. v. United States Fire Ins. Co., 389 N.Y.S.2d 214, 216 (N.Y. Sup. 1976) are readily distinguished.  In that case, the court considered a policy exclusion for "wear and tear, deterioration, rust or corrosion" where plaintiff sought coverage for deterioration in a 40-year-old building.  The court denied coverage, finding that the peril had been expressly excluded, and noting that the gradual deterioration and corrosion did "not take on the character of a subsequent fortuitous event."  Here, of course, the rupture of the sprinkler was the type of "subsequent fortuitous event" that ensuing loss provisions are designed to reach.

coverage, GNY has breached the policy; and (3) Five Star is entitled to summary judgment on GNY's first and second affirmative defenses, which are based on the Protective Safeguards Endorsement and the faulty design or faulty maintenance exclusion.

## IV.        FIVE STAR'S MOTION TO STRIKE

In opposing Five Star's motion for partial summary judgment, GNY submitted the declaration of expert witness Timothy McGreal.  (See McGreal Decl.)  McGreal describes himself as a "senior mechanical and fire protection engineer," and he prepared a forensic analysis concerning the cause of the Incident.  (McGreal Decl. ¶ 1)  McGreal also opines that, in failing to adequately heat the stairwells and in permitting the water in the sprinkler system to freeze, Five Star violated certain provisions of the Pennsylvania Code.  (McGreal Decl. ¶¶ 16-25)  GNY has also submitted McGreal's "Report of Findings," on which his Declaration is based.

Five Star has moved to strike McGreal's Report as well as those portions of his declaration in which McGreal asserts that Five Star did not comply with state law.  (Dkt. No. 31)  Five Star argues that these materials "consist of nothing more than misguided legal arguments and legal conclusions made in the guise of 'expert' testimony."  (Pltf. Mot. to Strike Br. at 2)

GNY has not argued that Five Star should be denied coverage because of its alleged violations of Pennsylvania law relating to fire safety.  Instead, GNY has argued that Five Star should be denied coverage under the Protective Safeguards Endorsement and the policy's exclusion for loss caused by faulty design or faulty maintenance.  The Court has resolved those issues against GNY on the basis of the policy's language.  In doing so, it has not considered the McGreal materials, which are irrelevant to that determination.  Accordingly, Five Star's motion to strike will be denied as moot.

V.      GNY'S MOTION FOR SUMMARY  JUDGMENT
        <u>ON FIVE STAR'S BAD FAITH CLAIM</u>

GNY has moved for summary judgment on Five Star's Fourth Cause of Action, which alleges that GNY acted in bad faith in its handling and denial of Five Star's claim, in violation of 42 Pa. Cons. Stat. Ann. § 8371.  Section 8371 provides that, "[i]n an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may [a]ward interest . . . punitive damages . . . [and] costs and attorney fees against the insurer."  42 Pa. Cons. Stat. Ann. § 8371.  Five Star argues that GNY's motion is premature, noting that Five Star has not had the opportunity to take discovery concerning this issue.  (Pltf. Reply Br. 16, 20)

A plaintiff asserting bad faith under § 8371 must show "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis."  <u>Altamari v. John Hancock Variable Life Ins. Co.</u>, 247 F. Supp. 2d 637, 649 (E.D. Pa. 2003) (citing <u>Klinger v. State Farm Mut. Auto Ins. Co.</u>, 115 F.3d 230, 233 (3d Cir. 1997)).  Under Pennsylvania law, "delay can be grounds for liability [under § 8371] if an insurer knows of or recklessly disregards the lack of any reasonable basis for its delay."  <u>Ania v. Allstate Ins. Co.</u>, 161 F. Supp. 2d 424, 430 n. 7 (E.D. Pa. 2001); <u>see also</u> <u>Kraeger v. Nationwide Mutual Ins. Co.</u>, No. Civ. 95-7550, 1996 WL 711488, *3 (E.D. Pa. Dec. 6, 1996) (unreasonable delay is grounds for a bad faith claim); <u>Thomas v. State Farm Ins. Co.</u>, No. Civ. 99-2268, 1999 WL 1018279, *2 (E.D.Pa. Nov. 5, 1999) (same).  Bad faith claims are very "'fact-specific and depend upon the specific conduct of the insurer vis-à-vis its insured.'"  <u>Amitie One Condominium Ass'n v. Nationwide Prop. & Cas. Ins. Co.</u>, 2008 WL 2973097, at *4 (M.D. Pa.

Aug. 4, 2008) (quoting <u>Zimmerman v. Harleysville Mut. Ins. Co.</u>, 860 A.2d 167, 173 (Pa. Super. 2004)).

Here, Five Star is entitled to discovery on its bad faith claim.  "Summary judgment is strongly disfavored prior to the parties having had an adequate opportunity for discovery."  <u>Park Avenue Bank, N.A. v. Bankasi</u>, 1995 WL 739514, at *1 (S.D.N.Y. Dec. 13, 1995); <u>see</u> <u>also</u> <u>Sutera v. Schering Corp.</u>, 73 F.3d 659, 665 (2d Cir. 1995) ("A party opposing a motion for summary judgment must have had the opportunity to discover information that is essential to its opposition to the motion.").  Moreover, there is already evidence in the record suggesting that GNY may have (1) known that it lacked a reasonable basis for its denial of coverage, or (2) acted in reckless disregard of whether it had a reasonable basis for denying Five Star's claim.  As discussed in Parts II and III, <u>supra</u>, there is virtually no case law support for GNY's interpretation of either the Protective Safeguards Endorsement or the design defect/faulty maintenance exclusion, and all of the cases that GNY has cited in support of its interpretation are easily distinguished.  Five Star also advised GNY four months after the Incident and five months before GNY denied coverage why the loss was covered under the policy.  (Artese Opp. Decl., Ex. 14 at 2)

There is also evidence of significant delay here.  The claims process consumed nearly nine months –  from December 24, 2008, to September 17, 2009 – even though (1) the cause of the loss set forth in the September 17, 2009 denial of coverage letter – frozen sprinkler pipes – is the same cause of loss set forth in GNY's forensic engineer's report dated January 12, 2009 (<u>compare</u> Artese Decl., Ex. D <u>with</u> Rappel Decl., Ex. 5 at HOL 95); and (2) GNY relied, in its September 17, 2009 denial of coverage letter, on the same provisions it had cited to Five Star in its January 14, 2009 Reservation of Rights letter.  <u>Compare</u> Rappel Decl., Ex. 6 <u>with</u> Artese

Decl., Ex. D.  To the extent that GNY argues that the delay was caused by its need to conduct

destructive testing on the pipes, that concern appears to go to subrogation and not to the merits of

Five Star's insurance claim.

GNY's motion for summary judgment on Five Star's bad faith claim will be

denied and discovery will proceed on that claim.

## CONCLUSION

Plaintiff Five Star's motion for partial summary judgment (Dkt. No. 12) is

GRANTED.  Five Star's motion to strike (Dkt. No. 31) is DENIED as moot.  GNY's cross-

motion for partial summary judgment (Dkt. No. 17) is DENIED.    The Clerk of the Court is

directed to terminate all three motions.

Dated:  New York, New York
        March 24, 2011

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

24